## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **NATALIE STOULIG AND CORY STOULIG** | **CIVIL ACTION** |
| **VERSUS** | **NO: 12-1557** |
| **UNION SECURITY INSURANCE COMPANY D/B/A ASSURANT EMPLOYEE BENEFITS** | **SECTION: "S" (1)** |

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment filed by Defendant, Union Security Insurance Company d/b/a Assurant Employee Benefits, (Doc. #22) is **GRANTED**, as to the validity of the intoxication exclusion provision of the accidental death and dismemberment coverage, and **DENIED** as to finding that the decedent died as a result of intoxication.

## BACKGROUND

This matter is before the court on a motion for summary judgment filed by defendant, Union Security Insurance Company d/b/a Assurant Employee Benefits ("USIC"). USIC argues that it is entitled to summary judgment because the intoxication exclusion in the insurance policy is valid, and that Eric J. Stoulig's death resulted, directly or indirectly, from his intoxication.

Stoulig was an employee of the Public Belt Railroad Commission of the City of New Orleans d/b/a New Orleans Public Belt Railroad, and was covered by group term life insurance and group accidental death and dismemberment insurance (Policy No. G4,031,259) issued by USIC. Stoulig's employer paid the premiums for the policy. Stoulig designated his wife, plaintiff Natalie Stoulig, as the beneficiary. The policy provided $50,000 in life insurance and an additional $100,000 in accidental death and dismemberment payments that were payable if Stoulig "die[d] as a direct result of an *injury*." The accidental death and dismemberment provisions also provided a higher education

benefit that was payable to each eligible dependent student[1] if Stoulig "die[d] as the direct result of an *injury*."   However, the accidental death and dismemberment and higher education benefits included the following exclusion:

> We will not pay benefits if the loss results directly or indirectly from:
>
>         *        *        *
>
> •     your intoxication; this includes but is not limited to operating a motor vehicle while you are intoxicated.
>
>        "Intoxication" and "intoxicated" mean your blood alcohol level at death or dismemberment exceeds the legal limit for operating a motor vehicle in the jurisdiction in which the loss occurs.

In May 2011, Stoulig traveled to Jackson, Wyoming with some co-workers for a railroad conference.  On May 24, 2011, Stoulig attended the conference events, which ended at 5:00 p.m. He ate dinner and drank alcoholic beverages at the hotel with other conference attendees. Thereafter, he and some colleagues went to a nearby tavern, where they drank more alcoholic beverages, listened to music and danced.  Stoulig's companions departed the tavern around 10:50 p.m., but Stoulig stayed at the tavern.  Ernest Meisner, Stoulig's co-worker, declared in an affidavit that Stoulig did not appear "intoxicated or mentally or physically impaired in any way."

---

[1] The policy defines "dependent student" as the decedent's unmarried children that are under twenty-five years old and enrolled full-time at an accredited school at the time of the decedent's death or do so within one year of the death.  Plaintiff Cory Stoulig was Stoulig's biological son and was enrolled full-time at Louisiana State University at the time of Stoulig's death.  Thus, Cory Stoulig fits the definition of "dependent student."

Stoulig returned to his hotel, and entered his room around 12:25 a.m. on May 25, 2011. The woman in the adjoining hotel room heard Stoulig enter the room and "shuffle around." Then she heard a dull thump followed by snoring.

The next morning, Meisner called Stoulig's cellular telephone to invite him to breakfast, but the calls were unanswered. When Meisner noticed that Stoulig was not at the conference, he called Stoulig's cellular telephone, and there was no answer. As a result, Meisner went to Stoulig's hotel room door and called Stoulig's cellular telephone. Meisner could hear Stoulig's cellular telephone ringing in the room. Meisner and a housekeeper entered the room where they found Stoulig lying on the floor, between the bed and the bathroom wall, on his back with his head propped against the night stand and his chin pushed into his chest. He was cold to the touch, unresponsive and appeared to be dead. Stoulig was in the same clothes he wore the night before and his room key and wallet were placed on the table. Meisner called emergency services.

The paramedics confirmed that Stoulig was dead. The police reports indicate that there was no blood on Stoulig's head or the night stand, that his skin was "mottled and his face was purple with what appeared to be lividity," and "his skin was very cold to the touch." The reports also noted that "[m]arks could be seen on Stoulig's neck that match[ed] the pattern on the collar of his sweater which was compressed between his chin and chest," and that there were marks on the back of his head "that appeared consistent with the edge/front of the night stand that his head had been leaning against."

Dr. A. Francine Tryka performed an autopsy on Stoulig. The autopsy report states:

> Post mortem external examination was remarkable for the deeply left plethoric appearance of the head and upper chest, neck region. This includes his entire face, and would not be consistent with livor as he was found lying on his back. This along with the significant amount

of venous congestion observed in the head and neck leads to the
conclusion that [t]he immediate cause of death was due to positional
asphyxia.

It also notes that Stoulig's blood alcohol concentration was 0.220% grams per 100 milliliters.  The
report concludes, "[i]n summary, this obese male found in a position so as to compromise both his
airway and venous return, was intoxicated, with immediate cause of death attributed to positional
asphyxia."

The death certificate, issued by Dr. Kiley R. Campbell, the county coroner, states that
Stoulig's death was accidental and immediately caused by positional asphyxia with an underlying
cause of airway and blood flow compromise.  It notes that Stoulig's blood alcohol concentration was
0.220% grams per 100 milliliters and that the "[s]ubject passed out with neck flexed to chest which
prevent blood flow back into heart . . . [and] compromised his airway."

On July 20, 2011, Natalie Stoulig made a claim to USIC for benefits under Stoulig's policy.
USIC paid the life benefits on August 4, 2011, but denied the payments under the accidental death
and dismemberment provisions citing the intoxication exclusion.[2]   USIC provided the opinion of
Dr. Allen Parmet, a medical consultant, who opined that at Stoulig's "level of intoxication, he would
have been soporific and significantly impaired in judgment and coordination."  Dr. Parmet also
opined that "the alcohol induced sedation caused him to lose consciousness in such a position that
his head was flexed maximally forward, compromising his airway and venous return.  In individuals
who are obese and with sleep apnea, this is demonstrated to compromise the airway and likely
venous return, resulting in asphyxiation."

---

[2] USIC also stated that Stoulig's death was the result of physical disease, but later recanted that
conclusion.

4

On January 5, 2012, plaintiffs obtained a report from Dr. William P. Newman, III, a professor of pathology at Louisiana State University Health Sciences Center.  Dr. Newman reviewed Dr. Tryka's autopsy report and the accompanying toxicology report.  He opined that Stoulig "died of positional asphyxia," and that the death was accidental.  Dr. Newman noted that Stoulig's brain was not examined although the scalp showed marks that corresponded to the night stand's drawer handle.  Dr. Newman stated that there could have been a "central nervous system event that might prove he had an underlying contusion, subarachnoid hemorrhage, a subdural hematoma, [or] a hypertensive hemorrhage" and that this information "would be very helpful in trying to understand what caused his unconsciousness and ultimate death."  Dr. Newman opined that "[w]ithout this information, uncertainty exists."

On February 13, 2013, Dr. Newman issued another report in which he stated that he reviewed the autopsy and toxicology reports, and also Dr. Parmet's report.  Dr. Newman "agree[d] that the deceased died of positional asphyxia."  He noted that "[s]everal voids exist in this case, but [he] is certain that from the information that is available, the deceased was intoxicated with a blood alcohol level of 0.220%."  Dr. Newman noted that there was information missing that could have been useful in determining if there was a postmortem increase in the blood alcohol level and if there was something else that caused Stoulig's unconsciousness and ultimate death, but he opined that after "assessing all of the available information, [Stoulig] died of positional asphyxia because of his intoxication."

Plaintiffs filed this action on May 29, 2012, in the Twenty-Ninth Judicial District Court, Parish of St. Charles, State of Louisiana alleging that USIC breached the insurance contract by failing to pay the accidental death and higher education benefits.  They allege that the insurance

policy's intoxication exclusion is inapplicable because it does not comply with Louisiana law pertaining to health and accident insurance policies, and that there is no competent evidence that Stoulig was intoxicated at the time of his death, or that intoxication caused his death.  USIC timely removed the action to the United States District Court for the Eastern District of Louisiana, alleging that this court has diversity subject matter jurisdiction under 28 U.S.C. § 1332, because the parties are of diverse citizenship and there is more than $75,000 in controversy.  On June 24, 2013, USIC filed the instant motion for summary judgment.

## ANALYSIS

### A.    Summary Judgment Standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); FED. R. CIV. PROC. 56(c).  If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial.  Celeotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  The non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case.  Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

**B.    Insurance Policy Interpretation**

An insurance policy is a contract, and its interpretation is a question of law. See Jarvis Christian Coll. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 197 F.3d 742, 746 (5th Cir. 2000). Under Louisiana law, insurance policies are construed by applying the general rules of contract interpretation set forth in the Louisiana Civil Code. La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So.2d 759, 763 (La. 1994).  The intent of the parties as reflected in the policy determines the extent of the coverage. Id. (citing LA. CIV. CODE art. 2045 (defining contractual interpretation as "the determination of the common intent of the parties"); Garcia v. St. Bernard Parish Sch. Bd., 576 So.2d 975, 976 (La. 1991)).  The words of an insurance policy are given their "general, ordinary, plain, and proper meaning . . . unless [they] have acquired a technical meaning." Id. (citing LA. CIV. CODE art.  2047; Breland v. Schilling, 550 So.2d 609, 610 (La. 1989); Capital Bank & Trust Co. v. Equitable Life Assur. Soc'y of U.S., 542 So.2d 494, 497 (La. 1989)).

When the language is clear and unambiguous, it must be enforced as written. See Reynolds v. Select Props. Ltd., 634 So.2d 1180, 1183 (La.1994). "When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE art. 2046. "'A contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight.'" Amoco Prod. Co. v. Tex. Meridian Res. Exploration Inc., 180 F.3d 664, 668-69 (5th Cir. 1999) (quoting Tex. E. Transmission Corp. v. Amerada Hess Corp., 145 F.3d 737, 741 (5th Cir. 1998)).

**C.      Validity of the Intoxication Exclusion**

Plaintiffs argue the intoxication exclusion should be stricken from the insurance policy because it does not comport with the provisions of Louisiana law regarding intoxication exclusions that are applicable to health and accident policies.   USIC argues that the Louisiana statutes pertaining to health and accident insurance policies do not apply to the insurance policy at issue because the policy, including the accidental death and dismemberment portion, is a life insurance policy, and Louisiana law does not specify terms for intoxication exclusions in life insurance policies.  Further, USIC contends that the intoxication exclusion is valid because the Louisiana Commissioner of Insurance approved it.

Title 22 of the Louisiana Revised Statutes, the "Louisiana Insurance Code," regulates the insurance industry, and is administered by the Commissioner of Insurance. LA. REV. STAT. §§ 22:1, 2.  Section 47 classifies types of insurance, including life and health and accident insurance:

> (1) Life. Insurance on human lives and insurances appertaining thereto or connected therewith.  For the purpose of this Code, the transacting of life insurance includes additional benefits, including the acceleration of life benefits in advance of the time they would otherwise be payable, in the event of death by accident; additional benefits in event of the total or permanent disability of the insured; and optional modes of settlement of proceeds.
>
> (2) Health and accident.
>
> (a) Insurance of human beings against bodily injury, disablement, or death by accident or accidental means, or the expense thereof, or against disablement, or expense resulting from sickness or old age, including insurance wherein the benefits are covered at a higher level where health care is received from a defined network of health care providers, provided, however, that such insurance meets all applicable requirements of Subpart I of Part I of Chapter 2 of this Title, R.S. 22:241 et seq., for provisions of coverage through designated providers of medical services.

Id. at § 22:47.

Chapter 4 of Title 22 regulates insurance contract requirements according to the type of insurance. See id. at § 22:851, et seq. Life insurance is regulated by the provisions of Part II, La. Rev. Stat. § 22:901, et seq., whereas Part III, La. Rev. Stat. § 22:971, et seq., applies to health and accident insurance. Section 22:975(B)(10), pertaining to health and accident policies, states that such policies cannot contain an intoxication exclusion unless it is, in substance, in the stated form or in a form approved by the Commissioner of Insurance.[3] Id. at § 22:975(B)(10). In contrast, section 22:943, which pertains to the exclusions and restrictions of group life insurance polices, does not include any specifications for an intoxication exclusion. See id. at § 22:943. Further, the Commissioner of Insurance is vested with the authority to approve insurance forms, and must disapprove of any policy provision that does not comply with Louisiana law or any rule or regulation promulgated by the Commissioner of Insurance. Id. at §§ 22:861, 22:862.

In Ward v. Fleming Co., Inc., 95 F.3d 49, *3 (5th Cir. 1996), the United States Court of Appeals for the Fifth Circuit examined the Louisiana Insurance Code's definitions of life and health and accident insurance and concluded that "the accidental death phrase in the life insurance definition refers to an accidental death provision contained within a life insurance policy, which grants additional benefits under the policy," but, "when accidental death benefits are present in a separate and independent policy, the appropriate classification is a 'health and accident' policy, rather than a life insurance policy." The court identified the following factors that Louisiana Courts have

---

[3] The stated form is:

> (10) Intoxicants and narcotics: The insurer shall not be liable for any loss sustained or contracted in consequence of the insured's being intoxicated or under the influence of narcotics unless administered on the advice of a physician.

LA. REV. STAT. § 22:975(B)(10).

9

used to determine whether accidental death and dismemberment provisions provided additional coverage under a life insurance policy or constituted a separate health and accident policy: (1) whether there was a different beneficiary designation form for the accidental death and dismemberment provisions; (2) whether the payroll deductions for the life and accidental death and dismemberment coverages were at different rates; (3) whether the premiums were deducted separately for the two coverages; and, (4) whether the employee could decline the life insurance coverage, while electing to maintain the accidental death and dismemberment coverage. Id. at *4.

In this case, the accidental death and dismemberment provisions granted additional benefits under Stoulig's life insurance policy, and were not a separate health and accident policy. As stated in the affidavit of Thomas Vargo, USIC's Vice President of Claims, the accidental death and dismemberment provisions did not have a separate beneficiary designation, different rate of payroll deductions or separate premium deduction. Also, Stoulig could not elect to have the accidental death and dismemberment coverage without the life insurance. Therefore, the accidental death and dismemberment provisions were part of Stoulig's life insurance policy, and the intoxication exclusion was not subject to the provisions of the Louisiana Insurance Code pertaining to health and accident policies. Further, as shown by the verified documents attached to the affidavit of Dixie Ladler, USIC's Senior Contract Compliance Analyst, the Louisiana Commissioner of Insurance specifically approved the intoxication exclusion contained in Stoulig's policy. Thus, the intoxication exclusion is a valid provision of the accidental death and dismemberment coverage that was part of Stoulig's life insurance policy.

**D.     Application of the Accidental Death and Dismemberment Exclusion**

USIC argues that it is entitled to summary judgment because there is no genuine issue of material fact that Stoulig met the definition of intoxication in the policy exclusion, and that Stoulig's death resulted, directly or indirectly, from his intoxication.  Plaintiffs contend that there are outstanding factual questions regarding whether Stoulig was intoxicated and whether that intoxication caused his death.   Plaintiffs also argue     that the intoxication exclusion should only apply in the case of operating a motor vehicle while intoxicated.

As stated above, the insurance policy excludes coverage for accidental death and dismemberment if the loss resulted, directly or indirectly, from the insured's intoxication, which includes, but is not limited to operating a motor vehicle while intoxicated.   The policy defines "intoxication" as having a blood alcohol level that exceeds the legal limit for operating a motor vehicle in the jurisdiction in which the loss occurs. The exclusion, by its plain terms, states that it applies if the loss occurs while the insured is intoxicated, and that it is not limited to operating a motor vehicle.   In Wyoming, the legal limit for operating a motor vehicle is 0.08% grams per 100 milliliters of blood. WYO. STAT. ANN. § 31-5-233.

The autopsy report states that Stoulig's blood alcohol level was 0.220% grams per 100 milliliters, and concludes that Stoulig died as a result of  positional asphyxia that compromised his airway and venous return due to intoxication.[4]  Moreover, plaintiffs' expert, Dr. Newman, opined

---

[4] Plaintiffs argue that the autopsy and toxicology reports are inadmissible hearsay.  Hearsay, an out of court statement offered to prove the truth of the matter asserted, is generally not admissible. FED. R. EVID. 801, 802.  Business records kept in the regular course of business and public records are exceptions to the hearsay exclusion rule. Id. at 803(6) & 803(8). Stoulig's autopsy report was submitted along with Dr. Tryka's affidavit attesting to its authenticity, and his toxicology report was submitted with the affidavit of Cynthia Riede, the custodian of records for the Jackson Police Department, verifying the authenticity of all of the police records, including the toxicology report.  Verifying affidavits, along with the business record exception to the hearsay rule, Fed. R. Evid. 803(6), permit the court to consider the autopsy and toxicology reports in

that, although there is missing information that could have been useful in determining whether there was a postmortem increase in Stoulig's blood alcohol level and whether there was something else that caused Stoulig's unconsciousness and death, when he assessed all available information, he concluded that Stoulig died of positional asphyxiation due to his intoxication.

Dr. Newman qualified his opinion by stating that the autopsy was incomplete due to the failure to examine Stoulig's brain which could have shown a "central nervous system event that might prove he had an underlying contusion, subarachnoid hemorrhage, a subdural hematoma, [or] a hypertensive hemorrhage" and that this information would be very helpful in trying to understand if there was something else that caused Stoulig's unconsciousness and ultimate death, but assessing all of the available information, Stoulig died of positions asphyxia because of his intoxication.  Dr. Newman opined that "[w]ithout this information, uncertainty exists."  Dr. Newman also opined that there was information missing from the autopsy report that could have helped him determine whether there was a postmortem increase in Stoulig's blood alcohol level.  Thus, there are genuine issues of material fact regarding Stoulig's intoxication and whether Stoulig's death resulted, directly or indirectly, from his intoxication, and USIC's motion for summary judgment is DENIED as to finding that Stoulig's death resulted, directly or indirectly, from his intoxication.

---

considering a motion for summary judgment. Fields v. City of S. Hous., Tex., 922 F.2d 1183, 1191  n. 9 (5th Cir. 1991).  Further, a death certificate meets the public records exception to the hearsay rule, Fed. R. Evid. 803(8).  Reliastar Life Ins. Co. v. Thompson, 2008 WL 4327259, at *3 (5th Cir. 2008).  However, under Louisiana law, "a death certificate is proof only of the death itself, not proof of the cause of death, and it is inadmissible for the purpose of showing cause of death." McKelvy v. City of Dequincy, 970 So.2d 682, 688 (La. Ct. App. 2007) (citations and quotations omitted). Thus, Stoulig's autopsy and toxicology report are admissible evidence regarding the cause of his death, and may be considered in connection with USIC's motion for summary judgment.

## CONCLUSION

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment filed by Defendant,

Union Security Insurance Company d/b/a Assurant Employee Benefits, (Doc. #22) is **GRANTED**,

as to the validity of the intoxication exclusion provision of the accidental death and dismemberment

coverage, and **DENIED** as to finding that the decedent died as a result of intoxication.


New Orleans, Louisiana, this __10th__ day of October, 2013.


                    **MARY ANN VIAL LEMMON**
                    **UNITED STATES DISTRICT JUDGE**